**Terrance M. CLARK, et al., Plaintiffs,**

v.

**BUFFALO WIRE WORKS CO., INC., Defendant.**

**No. 95–CV–0482(F).**

United States District Court, W.D. New York.

April 30, 1998.

Hurwitz & Fine, P.C., Dan D. Kohane, of counsel, Buffalo, NY, for Plaintiffs.

Brown & Kelly, L.L.P., Lisa T. Sofferin, of counsel, Buffalo, NY, for Defendant.

CURTIN, District Judge.

On March 18, 1998, Magistrate Judge Leslie G. Foschio filed a detailed report and recommendation concluding that defendant's motion for summary judgment should be denied in all respects.

The court has had an opportunity to review the report, the objections filed by defendant, and the response filed by plaintiffs to

the objections. After a careful review, the court concludes that the Magistrate Judge's report is in good order. Therefore, it is affirmed.

The court will meet with counsel on Tuesday, May 19, 1998, at 3 p.m. to set a further schedule and a date for trial. If any motions *in limine* are to be made, the parties should be ready to file the motions on that date or soon thereafter.

So ordered.

## REPORT AND RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

This case was referred to the undersigned by Hon. John T. Curtin on July 8, 1996, for report and recommendation of all dispositive motions. It is presently before the court on Defendant's motion for summary judgment (Doc. # 28), filed April 8, 1997.

### *BACKGROUND*

On June 14, 1995, Plaintiffs Terrance M. Clark, Anthony S. Miszuk and Nicholas Nesteruk filed this action alleging Defendant Buffalo Wire Works Co., Inc., unlawfully terminated Plaintiffs' employment with Defendant in violation of the Age Discrimination in Employment Act of 1967, as amended by the Older Workers Benefit Protection Act, 29 U.S.C. §§ 600 *et seq.* ("the ADEA"), and New York Human Rights Law, N.Y. Exec. Law § 296 *et seq.* Specifically, Plaintiffs assert six claims, including three violations of the ADEA, and N.Y. Exec. Law §§ 296 *et seq.*, negligent infliction of emotional distress, and intentional infliction of emotional distress.

Defendant's answer, filed August 7, 1995, asserts five affirmative defenses, including that the instant claims are barred based on (1) release, (2) equitable estoppel, (3) applicable statutes of limitations with regard to the infliction of emotional distress claims, (4) lack of pendent jurisdiction over the state law claims, and (5) Plaintiffs' election of administrative remedies. Defendant also asserts a counterclaim demanding rescission of the sums paid Plaintiffs under the terms of the termination agreements executed by the parties in connection with the termination of Plaintiffs' employment, insofar as the court may determine that Plaintiffs claims are not barred by such agreements.

Defendants originally moved for summary judgment on December 9, 1996. That motion was withdrawn on April 8, 1997 when Defendants filed an amended motion for summary judgment on the basis that termination agreements signed by Plaintiffs in connection with their discharge constitute releases which bar litigation of the instant claims.

Plaintiffs' opposition to summary judgment was timely filed on June 13, 1997. Defendant replied in further support of summary judgment on July 3, 1997.

By letter to the court filed March 10, 1998, Defendant withdrew its motion for summary judgment insofar as that motion depends on the validity and enforceability of the termination agreements with respect to Plaintiffs' ADEA claims. Accordingly, the motion for summary judgment is currently before the court only with regard to the pendent state claims.

Based on the following discussion, Defendant's motion for summary judgment should be DENIED.

### *FACTS* [1]

Plaintiff Terrance M. Clark commenced employment with Defendant Buffalo Wire Works Co., Inc. ("Buffalo Wire") in 1972. Clark was promoted to the position of foreman of the heavy aggregate screen department in 1976. Plaintiff Anthony S. Miszuk began working for Buffalo Wire in 1961 and was promoted to the position of foreman of the fabrications department in 1979. Plaintiff Nicholas Nesteruk started working for Buffalo Wire in 1974. Nesteruk was promoted to the position of foreman of the shipping department in 1979. Plaintiffs were unionized employees of Buffalo Wire until 1980, when all Buffalo Wire foreman positions became salaried, non-union positions. All three

---

1. The fact statement is taken from the Complaint, Answer, and motion papers filed in this action.

Plaintiffs occupied their foreman positions until their employment with Buffalo Wire was terminated on May 16, 1994.

On May 16, 1994, Plaintiffs were called into a meeting with Charles Scheeler, President of Buffalo Wire. Scheeler informed Plaintiffs that their employment with Buffalo Wire had been terminated that day and presented each Plaintiff with an Employment Termination Agreement ("the Agreements"). Each Agreement states in its entirety:

### EMPLOYMENT TERMINATION AGREEMENT

In recognition of [specific number of] years of service to Buffalo Wire and for other good and valuable consideration, it is agreed that Buffalo Wire will pay [Plaintiff] the lump sum of [dollars] in return for which [Plaintiff] releases and forever discharges Buffalo Wire, its officers, supervisors, agents and representatives from any and all claims and demands of any type or nature arising out of or related to his employment relationship with Buffalo Wire, including, but not limited to, claims of discrimination based upon race, sex, age, national origin, and physical or mental disability. [Plaintiff] shall have five (5) days to consider the terms of this Agreement and return an executed copy to Buffalo Wire.

According to Buffalo Wire, the monetary amount paid to each Plaintiff under the Agreements represented one week of pay for each year of service to Buffalo Wire.[2] Each Plaintiff signed his copy of the Agreement. Clark returned his signed Agreement to Buffalo Wire on May 20, 1994. Miszuk and Nesteruk each returned their signed Agreements to Buffalo Wire on May 19, 1994. That each Plaintiff received his severance pay is undisputed.

None of the Plaintiffs discussed the Agreements with an attorney prior to signing or returning them to Buffalo Wire. It is the position of Buffalo Wire that the Agreements contain provisions which release Buffalo Wire from liability for any claims arising out of or related to Plaintiffs' employment with Buffalo Wire. Plaintiffs maintain that they did not understand when they signed the Agreements that they were relinquishing their rights to pursue legal action with regard to their terminations. Plaintiffs further allege that at the time of their termination from Buffalo Wire, although they did not know of any express severance pay policy in effect as to non-union employees of Buffalo Wire, they were aware of other non-union employees who had received severance pay upon involuntary termination of employment with Buffalo Wire prior to attaining normal retirement age. Plaintiffs assert that they relied on the implied severance pay policy in continuing their employment with Buffalo Wire. At the time of their termination from Buffalo Wire, Clark was fifty-four, Miszuk was fifty-one and Nesteruk was fifty-five years of age.

Plaintiffs maintain that on May 16, 1992, they were the three oldest foremen at Buffalo Wire. Plaintiffs also allege that they were at various times referred to by agents and officers of Buffalo Wire as "pops," "old man," and "too old to change." Additionally, Plaintiffs allege they were told that anyone near age sixty-two should either retire or he would be given a "lousy job to force him to retire." Miszuk and Nesteruk further claim that upon being discharged by Buffalo Wire on May 16, 1994, they requested that Buffalo Wire permit Miszuk and Nesteruk to rejoin Buffalo Wire as union employees in union positions. Buffalo Wire denied those requests, although similar requests made by two younger foremen were granted.

Charges of Employment Discrimination based on age were filed with the Equal Employment Opportunity Commission ("EEOC") by Clark on August 26, 1994, by Miszuk on July 21, 1994, and by Nesteruk on August 30, 1994. Each of the three Plaintiffs received a "Notice of Right to Sue" from the EEOC dated March 23, 1995. Thereafter, on June 14, 1995, Plaintiffs commenced the instant action.

---

**2.** According to the Agreements, Clark, with twenty-two years of service, was to receive $14,370.40. Miszuk, with thirty-two years of service, was to receive $21,491.20. Nesteruk, with twenty years of service, was to receive $13,224.00.

Each Plaintiff received his severance pay in a lump sum payment. However, although not stated in the Agreements, regular employee withholdings, including federal and state income taxes, insurance, and employee pension plan contributions, were deducted from the amounts paid, rendering the lump sum payments received substantially less than the amounts listed in the Agreements. It is undisputed that to date, none of the Plaintiffs returned any of the money received under the terms of the Agreements. As such, Buffalo Wire maintains that even if it is determined that the Agreements are voidable, by failing to tender back their severance pay, each Plaintiff ratified his Agreement, including the release provision and is now bound by its terms.

## DISCUSSION

Summary judgment will be granted when the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The moving party for summary judgment bears the burden of establishing the nonexistence of genuine issue of material fact. If there is any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party cannot obtain a summary judgment. *Celotex, supra,* 477 U.S. at 331, 106 S.Ct. 2548.

The function of a district court in considering a summary judgment motion is not to resolve disputed issues of fact, but to determine whether there is a genuine issue to be tried. *Rattner, supra,* at 209. In assessing the record, including any affidavits, exhibits, and other submissions, the court is required to resolve all ambiguities and to draw all factual inferences in favor of the nonmoving party. *Anderson, supra,* 477 U.S. at 255, 106 S.Ct. 2505; *Rattner, supra,* at 209.

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no issue as to any material fact, and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson, supra,* 477 U.S. at 247–48, 106 S.Ct. 2505. *See also Lipton v. The Nature Company,* 71 F.3d 464, 469 (2d Cir.1995). While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The nonmoving party may defeat the summary judgment motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Celotex, supra,* 477 U.S. at 322–23, 106 S.Ct. 2548. "Mere conclusory allegations or denials" in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist. *Lipton,* supra, at 469.

Buffalo Wire maintains that by executing the Agreements in connection with the termination of Plaintiffs' employment with Buffalo Wire, each Plaintiff "release[d] and forever discharge[d] Buffalo Wire, its officers, supervisors, agents and representatives from any and all claims and demands of any type or nature arising out of or related to his employment relationship with Buffalo Wire, including, but not limited to, claims of discrimination based upon race, sex, age, national origin, and physical or mental disability." Accordingly, Buffalo Wire asserts that, as a matter of law, Plaintiffs' claims are barred in their entirety by the releases contained in the Agreements Plaintiffs executed in connection with the termination of their employ-

ment with Buffalo Wire. However, based on the Supreme Court's recent decision in *Oubre v. Entergy Operations, Inc.*, — U.S. —, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998), Buffalo Wire advised the court that it was withdrawing its motion for summary judgment with respect to Plaintiffs' ADEA claims, conceding that in accordance with *Oubre*, the issue of the validity of the purported releases was resolved in Plaintiffs' favor.[3] Letter from Lisa T. Sofferin to the Court (Doc. # 44), filed March 10, 1998. Buffalo Wire also stated its intention to pursue its motion for summary judgment based on the defense of release with regard to the state law claims.[4] *Id.* The court thus addresses the validity of the Agreements under New York law.

■ Buffalo Wire originally conceded that the Agreements were voidable with regard to the ADEA claims but did not make similar concessions at to the state law claims. Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Defendant's Memorandum of Law"), filed April 8, 1997, at 5. Instead, Buffalo Wire maintains that even if the Agreements could be challenged as "voidable" with regard to the state law claims, Plaintiffs' state claims are nevertheless barred by Plaintiffs' failure to "tender back" the consideration—the severance pay—received in exchange for executing the Agreements including the release provisions

contained therein. *Id.*, at 22–23. Under the tender back doctrine, a former employee who seeks to negate a release and sue the former employer must return to the employer the benefits received as consideration for executing a release purporting to absolve the employer from liability to employees based upon the termination of employment. *Kristoferson v. Spunkmeyer*, 1997 WL 297027, *1 (S.D.N.Y.1997). Otherwise, according to the doctrine, if such consideration is not so "tendered" prior to commencement of an action, the plaintiff will be held to have ratified the release when there is or could be some ground for its rescission. *Kristofferson, supra.*

■ The purpose of the tender back doctrine is to prevent enabling "a plaintiff who has already received substantial consideration for a release to keep that consideration while at the same time bringing the very lawsuit the release was intended to obviate." *Kristofferson, supra,* at * 4. Courts which have upheld the tender back rule, including courts within the Second Circuit, generally consider it as an element of the contract doctrine of ratification. *Fleming v. United States Postal Service AMF O'Hare*, 27 F.3d 259, 262 (7th Cir.1994); *Reid v. I.B.M Corporation*, 1997 WL 357969, *10 (S.D.N.Y.1997). Ratification is an act by which an otherwise voidable and, as a result, invalid contract is confirmed, and thereby made valid. *Wittorf*

---

**3.** In *Oubre,* the Supreme Court held that an employee may not waive an ADEA claim unless the waiver or release of such claim strictly complies with the OWBPA's statutory requirements. *Oubre, supra,* 118 S.Ct. at 841. Additionally, the Court stated that there was no statutory prerequisite that a plaintiff tender back any benefits received under such waiver or release to avoid ratifying the contract. *Oubre,* at 841–42. The Court, however, specifically refrained from addressing whether a release or waiver that did not comply with the OWBPA was effective with regard to non-ADEA claims. *Oubre,* at 842. In concurrence, Justice Breyer specified that the OWBPA "makes the contract that the employer and worker tried to create *voidable,* like a contract made with an infant or a contract created through fraud, mistake or duress, which contract the worker may elect either to avoid or ratify." *Oubre,* at 843–44 (emphasis added). However, Justice Breyer also stated a plaintiff's failure to tender back consideration received in exchange for executing the purported release was not a ground for ratification. *Oubre,* at 844. Accord-

ingly, the ADEA claim must proceed to trial where it will be determined by the trier of fact whether the releases are enforceable under the OWBPA and, if not, whether they were nevertheless ratified by Plaintiffs.

**4.** The same elements are required to establish an age discrimination claim under the ADEA as under the New York Human Rights Law. *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 467 (2d Cir.1997). Additionally, "the remedies are the same under both federal [ADEA] and state [New York Human Rights Law] law, with the exception that under the state law, recovery for emotional distress is permitted." *Hastie v. J.C. Penney Co., Inc.*, 886 F.Supp. 1017, 1026 (W.D.N.Y.1994)(citing *Johnson v. Al Tech Specialties Steel Corp.*, 731 F.2d 143, 147 (2d Cir. 1984)). Here, Plaintiffs also have alleged common law actions for intentional infliction of emotional distress for which punitive damages are recoverable under state, but not federal law. 29 U.S.C. §§ 626(b).

v. Shell Oil Co., 37 F.3d 1151, 1154 (5th Cir.1994); Reid v. I.B.M. Corporation, 1997 WL 357969, *10 (S.D.N.Y.1997); Hodge v. New York College of Podiatric Medicine, 940 F.Supp. 579, 583 (S.D.N.Y.1996).[5] The contracts at issue here are the Employment Termination Agreements executed by Plaintiffs in connection with their discharge.

■ In New York, however, the tender back rule was abolished both for procedural and substantive law purposes by enactment of § 112–g of the New York Civil Practice Act.1946 N.Y. Laws ch. 683, re-codified as N.Y. Civ. Prac. L. & R. § 3004 (McKinney 1974); Skipworth v. Cooper, 37 A.D.2d 906, 325 N.Y.S.2d 485 (4th Dep't.1971). See Korn, Weinstein & Miller, New York Civil Practice—CPLR, ¶ 3004.01 et. seq., at 30–194—30–203, (1991); David D. Siegel, New York Practice, § 215, at 312 (2d ed.1991). In particular, § 3004 provides that a party who received a benefit from a void or voidable transaction need not tender back such benefit before commencing legal action, although "the court may make a tender of restoration a condition of its judgment, and may otherwise in its judgment so adjust the equities between the parties that unjust enrichment is avoided." N.Y. Civ. Prac. L. & R. § 3004 (McKinney 1974). Therefore, should Plaintiffs ultimately prevail in this action, any award may be adjusted in consideration of

the severance paid to Plaintiffs by Buffalo Wire.[6]

Here on the issue remaining open on Defendant's motion, Plaintiffs argue that the Agreements are void and unenforceable under state law because (1) Plaintiffs lacked the requisite knowledge to render their execution of the Agreements voluntary, and (2) no valid consideration was received in exchange for the releases. Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Plaintiffs' Memorandum of Law"), filed June 13, 1997, at 24. Plaintiffs have not, however, either cross-moved for summary judgment nor asserted grounds on which the court may find that the releases are void as a matter of law. The court must therefore determine whether a material issue of fact exists that the Agreements are valid or voidable.

■ Whereas a waiver of a claim under the ADEA is valid only if it strictly complies with the requirements of the OWBPA, Oubre, supra, 118 S.Ct. at 841, the validity of a release under New York law is determined based on common law contract principles. Mangini v. McClurg, 24 N.Y.2d 556, 301 N.Y.S.2d 508, 249 N.E.2d 386, 389 (1969); Verstreate v. Cohen, 242 A.D.2d 862, 662 N.Y.S.2d 337, 338 (4th Dep't.1997). Releases are not to be disregarded and, "[i]n the absence of fraud, duress, illegality or mistake, a

5. If, however, a contract is determined invalid because it is void, such contract could never be ratified. See Hodge, supra, at 583. A void contract or release cannot be enforced because there is no meeting of the minds and thus no agreement. Durante Bros. and Sons, Inc. v. Flushing National Bank, 755 F.2d 239, 252 (2d Cir.), cert. denied, 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985). Such voidness arises from fraud in the execution, i.e., where a party does not know or is misled as to what it is he is signing, and legal incapacity of a party. Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 31–32 (2d Cir.1997). Voidness also arises where the agreement violates fundamental public policy as reflected in statute or other prevailing caselaw. Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 77, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982). However, as noted, see n. 3, supra, at p. 371, the Supreme Court in Oubre did not hold that releases which fail to conform to the OWBPA are void and thus beyond ratification.

6. There are several additional factors to be considered in determining whether an otherwise

voidable contract has been ratified including the employee's awareness of the voidable nature of the release and the length of time the employee retained the consideration after learning of the release was voidable before disavowing such release, and whether the circumstances which made the release voidable persisted. See Wamsley v. Champlin Refining and Chemicals, Inc., 11 F.3d 534, 538–39 (5th Cir.1993)(discussing ratification of a voidable release with regard to OWBPA claim and holding that plaintiffs had ratified release); Reid, supra, at *6 (finding ratification of a voidable release where plaintiff never claimed that he continued to be incapacitated by the factors which had rendered the release voidable); DiRose v. PK Management Corp., 691 F.2d 628, 633–34 (2d Cir.1982), cert. denied, 461 U.S. 915, 103 S.Ct. 1896, 77 L.Ed.2d 285 (1983) ("A contract or release, the execution of which is induced by duress, is voidable, not void, and the person claiming duress must act promptly to repudiate the contract or release or her will be deemed to have waived his right to do so").

general release bars an action on any cause of action arising prior to its execution." *Mergler v. Crystal Properties Associates, Ltd.,* 179 A.D.2d 177, 583 N.Y.S.2d 229, 230–31 (1st Dep't.1992). Additionally, the enforceability of a release does not depend on whether the releasor was subjectively aware of the precise claims to which the release pertains upon executing the release. *Mergler, supra,* at 232 Instead, if the language of a contract, including a release, is clear and unambiguous "effect will be given to the intention of the parties as indicated by the language employed and the fact that one of the parties may have intended something else is irrelevant." *LeMay v. H.W. Keeney, Inc.,* 124 A.D.2d 1026, 508 N.Y.S.2d 769, 770 (4th Dep't.1986); *leave denied,* 69 N.Y.2d 607, 514 N.Y.S.2d 1025, 507 N.E.2d 321 (1987). However, if an ambiguity is present, construction of the release is a question of fact. *Mosberg v. National Property Analyst, Inc.,* 217 A.D.2d 482, 630 N.Y.S.2d 50, 54 (1st Dep't.1995). Accordingly, Plaintiffs' argument that they lacked proper knowledge such that their execution of the Agreements was involuntary is not a ground to find a release unenforceable or voidable under state law and the court examines the validity of the Agreements based on whether Plaintiffs received valid consideration in return for executing them.

A release is not valid unless the party giving the release receives something of value to which the party was not otherwise entitled. *Weiner v. McGraw–Hill, Inc.,* 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441, 444 (1982). Unless Plaintiffs received consideration in exchange for releasing Buffalo Wire from liability with regard to the instant state law claims, the Agreements are unenforceable. *Id.* To prevail on the instant motion, Defendant must show there are not material issues of fact going to this issue and that the releases are valid as a matter of law.

Plaintiffs first maintain they were never advised that income taxes and employee 401(k) contributions would be deducted from the lump sum severance payments. Plaintiffs' Memorandum of Law, at 20. However, the fact that the Agreements do not mention that Plaintiffs' normal employee withholdings would be deducted from the lump sum severance payment to be paid by Buffalo Wire is insufficient to void the Agreements. *Dalessandro v. Monk,* 864 F.2d 6, 8 n. 1 (2d Cir.1988)(holding that former employer's withholding of income taxes from lump sum severance payment was not basis for rescission of employment separation agreement containing release provision).

Plaintiffs also maintain that the Agreements are unclear as nowhere within the Agreements is it specified what portion of the severance payments was paid "in recognition of [ ] years of service" as compared to "other good and valuable consideration." Plaintiffs' Memorandum of Law at 19. Also, Plaintiffs point to the fact that Buffalo Wire's Chief Financial Officer, Michael Rodems, was unable to specify at his deposition what portion of the severance payments was received in exchange for service to Buffalo Wire. *Id.,* at 19–20. Instead, Plaintiffs maintain they believed that Defendant had an implied policy of providing severance payments to all non-union employees over age forty whose employment with Buffalo Wire was involuntarily terminated by Buffalo Wire prior to attaining normal retirement age. *Id.* at 17–18. Accordingly, Plaintiffs allege they believed they were entitled to severance pay regardless of whether they executed any release and, as such, the Agreements were executed by Plaintiffs absent fresh consideration.

Buffalo Wire argues that any allocation of the severance paid to Plaintiffs would be purely speculative as there was no implied severance policy at Buffalo Wire. Defendant's Reply Memorandum of Law, at 3. In fact, Buffalo Wire maintains that Rodems's comments are cited by Plaintiffs out of context and that, in its entirety, Rodems's deposition testimony established that no severance would have been paid to any Plaintiff who failed to execute his Agreement. *Id.*

In New York, if an "employer engaged in a practice of making severance payments to non-union employees on the termination of employment, and if such employees relied on this practice in accepting or continuing their employment, plaintiffs have a cause of action against the defendant." *Mor-*

*schauser v. American News Company*, 6 A.D.2d 1028, 178 N.Y.S.2d 279, 280 (1st Dep't.1958); *see also, Smith v. New York State Electric and Gas Corporation*, 155 A.D.2d 850, 548 N.Y.S.2d 117, 118 (3d Dep't.1989)(affirming dismissal of action to recover for employer's alleged breach of severance pay policy for salaried employee where plaintiff failed to provide "evidence of (1) a regular practice by defendant to make severance payments, and (2) his reliance on that practice in accepting or continuing his employment"). Here, Plaintiffs, in opposing summary judgment, submitted affidavits in which each Plaintiff states that he relied on Buffalo Wire's implied severance pay policy in addition to comments made by Charles Scheeler, Sr., President of Buffalo Wire, that they would be "taken care of" whenever their employment with Buffalo Wire ceased. Affidavit of Terrance M. Clark ("Clark Affidavit"), filed June 13, 1997, at ¶¶ 6, 8, 9 and 10; Affidavit of Anthony S. Miszuk ("Miszuk Affidavit"), filed June 13, 1997, at ¶¶ 6, 8, 9 and 10; and Affidavit of Nicholas Nesteruk ("Nesteruk Affidavit"), filed June 13, 1997, at ¶¶ 6, 8, 9 and 10.

Defendant argues that Plaintiffs should not be permitted to rely on affidavits that contradicts Plaintiffs' previous deposition testimony to establish that a material issue of fact exists, thus defeating Buffalo Wire's motion for summary judgment. Defendant's Reply Memorandum of Law, at 3–4 (citing Defendant's Memorandum of Law at 14–18 wherein selected portions of each Plaintiff's deposition testimony is restated). However, the cited portions of Plaintiffs' deposition testimony do not support Buffalo Wire's contentions. Specifically, such testimony indicates that although Plaintiffs were not certain precisely how much severance pay each Plaintiff was entitled to upon discharge from Buffalo Wire's employ, each Plaintiff nevertheless believed he was entitled to some severance, regardless of the method of calculation. Defendant's Reply Memorandum of Law, at 14–18. Plaintiffs' Affidavits indicate they relied on that implied policy in continuing their employment with Buffalo Wire. Clark Affidavit. ¶ 5; Miszuk Affidavit, ¶ 5; and Nesteruk Affidavit, ¶ 5. In fact, the record indicates that every non-union employee of Buffalo Wire who was discharged before May 16, 1994, after age forty, but prior to normal retirement age, did receive severance pay. Deposition Testimony of Michael George Rodems, attached as Exhibit U to Defendant's Notice of Motion, at 23–24 and 62–64 (Thomas Zielinski), 31–32 (Robert Sweimler), 34–35 (Thurmond Mays), and 44–45 (Frederick Lewis Holliday). In contrast, terminated employees under age forty did not receive severance pay. *Id.*, at 27–29, 30–31, 38–40, 41–41 and 49. Additionally, there is no indication that the other discharged employees who received severance payment were required to execute releases prior to receiving severance benefits. Deposition Testimony of Robert A. Lawrence, attached as Exhibit T to Defendant's Notice of Motion, at 56. Whether such a policy existed is an issue of fact which cannot be resolved by the court on a motion for summary judgment.

Buffalo Wire maintains that only severance payments made to employees terminated under similar circumstances are relevant to the determination as to whether an implied policy of providing severance pay was in effect at Buffalo Wire. Defendant's Memorandum of Law, at 10. Defendants further argue that even if Plaintiffs establish an issue of fact regrading the existence of an implied policy, nothing prohibited Buffalo Wire from amending such policy and, in fact, Buffalo Wire decided in 1994 not to pay severance to any terminated employee without first obtaining a release. Defendant's Reply Memorandum of Law, at 10. Accordingly, Buffalo Wire asserts that Plaintiffs cannot rely on the fact that severance was received by Robert Sweimler and Basile Korbut in establishing the existence of an implied severance pay policy, as Sweimler retired based on health problems and Korbut was discharged *after* May 16, 1994, the date Plaintiffs were discharged. Defendant's Reply Memorandum of Law, at 4–5.

Buffalo Wire also maintains that no severance was paid to Patricia Jaworski who voluntarily resigned and that the decision to provide severance pay to Thomas Zielinski who was discharged for cause was based on the Buffalo Wire's desire for an amicable parting with Zielinski who maintained profes-

sional relationships with most of Buffalo Wire's vendors and also possessed keys to Buffalo Wire's entire manufacturing plant. *Id.;* Defendant's Memorandum of Law at 11–12. Nevertheless, such arguments do not negate the existence of evidence that every employee over age forty whose employment with Buffalo Wire was involuntarily terminated prior to normal retirement age received some amount of severance pay, which is relevant to the issue of whether Buffalo Wire maintained an implied severance pay policy. It is thus for the trier of fact to determine what weight, if any, should be given to the similarity of the circumstances under which other employees were discharged with severance pay, compared to the circumstances under which Plaintiffs were discharged on the issue of whether a severance policy existed and whether Plaintiffs reasonably relied on it.

Buffalo Wire also asserts the statement allegedly made by Buffalo Wire President Scheeler as assurance to Plaintiffs that they would "be taken care of" when their employment with Buffalo Wire ceased is unenforceable as it violates the statute of frauds pursuant to which all oral agreements, promises or undertakings are void if they cannot be fulfilled within one year. Defendant's Reply Memorandum of Law, at 7. However, at issue here is not an express oral agreement but, rather, an implied policy, and the alleged statement attributed to Scheeler is not the only evidence as to the existence of that policy. Defendant, relying of *Saunder v. Baryshnikov,* 110 A.D.2d 511, 487 N.Y.S.2d 51 (1st Dep't.1985). further argues that the statement is too vague to support a finding of a promise by Buffalo Wire. Defendant's Reply Memorandum of Law, at 7. Buffalo Wire's reliance on *Saunder* is, however, misplaced as in that case, the plaintiff sought to enforce an alleged oral promise made by her former employer that plaintiff would take care of her financial needs for the rest of her life. Significantly, in contrast to the evidence presented in this case, in *Saunder* the only evidence of such promise was the alleged oral statement and, as plaintiff was the defen-

dant's only employee, no argument for an implied policy based on a regular pattern of conduct could be made. *Saunder, supra,* at 52.

Nowhere in the Agreements is there any mention that Plaintiffs will not receive any severance benefits unless Plaintiffs execute the Agreements. That fact is significant considering Buffalo Wire provided severance benefits to all other non-union employees who were discharged after age forty, but before normal retirement age. Moreover, Plaintiffs, by submitting affidavits in which they assert they relied on an implied severance benefits policy in continuing their employment with Buffalo Wire, have demonstrated an issue of material fact.

As there is an issue of fact as to whether Buffalo Wire had an implied severance pay policy, there is also an issue of fact as to whether Plaintiffs received fresh consideration in exchange for executing the Agreements and thus. whether the release provisions contained therein are valid.[7] Accordingly, the court finds that summary judgment cannot be granted to Buffalo Wire.

### CONCLUSION

Based on the foregoing discussion, Defendant's motion for summary judgment (Doc. # 28), should be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the*

---

7. As discussed, supra, n. 6, as the Agreements are voidable, there may be grounds other than Plaintiffs' failure to tender back consideration received on which the trier of fact may find that Plaintiffs have ratified the Agreements with regard to both the ADEA and the state law claims.

*District Court's Order.* *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiffs and the Defendant.

SO ORDERED.